## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF KANSAS

| | |
|---|---|
| **PETE FRANKLIN and**<br>**C & F INVESTMENTS, LLC,**<br><br>**Plaintiffs,**<br><br>**v.**<br><br>**CITY OF MERRIAM, KANSAS,**<br><br>**Defendant.** | )<br>)<br>)<br>)<br>)<br>)<br>)       **No. 06-2421-CM**<br>)<br>)<br>)<br>)<br>) |

## MEMORANDUM AND ORDER

Plaintiffs Pete Franklin and C & F Investments, LLC ("C & F") bring this action claiming that defendant City of Merriam denied plaintiffs their federal and state constitutional rights to equal protection when defendant allowed another entity to operate a car dealership on a plot of land after previously denying plaintiffs the right to do so. The case is before the court on Defendant's Motion for Summary Judgment (Doc. 100) and Plaintiffs' Motion for Partial Summary Judgment (Doc. 103). For the following reasons, the court grants defendant's motion and denies plaintiffs'.

**I.       Factual Background**[1]

A.       Plaintiffs' Application to Change the Land Use

Plaintiff Franklin is the majority owner of C & F, a Kansas limited liability company. Plaintiff Franklin became interested in purchasing and relocating the Jay Wolfe Suzuki dealership.

---

[1]  The court construes the facts in the light most favorable to plaintiffs as the non-moving parties pursuant to Fed. R. Civ. P. 56, although plaintiffs filed their own motion for partial summary judgment. The court has included only those facts which are relevant, material, and properly supported by the record.

He found property located at 6639 E. Frontage Road, Merriam, Kansas, that had a vacant Burger King restaurant on it (the "Burger King property"). Before purchasing the property, plaintiff Franklin met with Paul Glaves, who was the City of Merriam's Community Development Director at the time, to discuss the proposed car dealership on the Burger King property and determine whether Mr. Glaves would support it. As Development Director, Mr. Glaves would be responsible for drafting a Staff Report recommending that the Planning Commission grant or deny plaintiff Franklin's proposal. Mr. Glaves told plaintiff Franklin that he would support his proposal, but that he would be retiring soon. The content of a Staff Report is important; Mr. Glaves testified in deposition that "Staff recommendation was given great weight. Probably staff recommendation was upheld by the planning commission somewhere in the neighborhood of 9 times out of 10 or more." (Glaves Dep., 52:17–23).

On behalf of C & F, plaintiff Franklin executed a Real Estate Purchase Agreement for the purchase of the Burger King property on February 3, 2004. He intended to create another entity to lease the property from C & F and operate the car dealership.

On February 4, 2004, plaintiff Franklin submitted a Planned Unit Development ("PUD") Application Z-2-04 (the "Franklin Application") for a change in use of the Burger King property from a restaurant to a used car dealership. Mr. Glaves authored a Staff Report recommending approval of the Franklin Application, but he retired before the Planning Commission held a public hearing on the application. Dustin Smith replaced Mr. Glaves as Development Director and authored a new Staff Report recommending denial of the Franklin Application. Although the Staff Report does not state Mr. Smith's reasons, Mr. Smith testified in deposition that the Burger King had not been vacant for long and the City had not had the opportunity to pursue other restaurant

-2-

options.[2]  Mr. Smith also believed that a car dealership would not complement the nearby hotels.  In addition, he was aware that the City's philosophy was to diversify the economy away from the automobile industry.

On July 7, 2004, the Planning Commission held a public hearing on the application and voted unanimously to recommend denial of the Franklin Application.  The Commission cited the density of the site and a desire for a restaurant at the location as reasons for the recommendation.  After the Commission voted, plaintiff Franklin began arranging to sell the Burger King property.  C & F entered into a contract to sell it on July 29, 2004.  The City Council heard the Franklin Application on August 16, 2004.  At that time, plaintiff Franklin's attorney, Douglas DeZube, requested a continuance, indicating that C & F had a pending contract with Merriam Pointe, a developer who intended to put a restaurant on the site, but that plaintiff Franklin wanted to proceed with the application if the contract fell through.  The City Council did not continue the hearing (although the members did not vote on whether to continue it) and voted unanimously to deny the application.  In deposition, Council member Nancy Hupp testified that the City Council is required to conduct a vote on whether to grant a request for a continuance.  C & F sold the Burger King property to Merriam Pointe on or about September 16, 2004.

Although the minutes from the City Council meeting do not indicate the members' reasons for voting to deny the application, several members testified about their reasons during deposition. Two members said that they wanted a restaurant at the location.  Two had concerns about whether

---

[2]  Plaintiffs contend that any reasons given for decisions not specifically enumerated in official documents or meeting minutes are not admissible evidence.  Specifically, they repeatedly ask the court to disregard deposition testimony given by decisionmakers about the reasons they made a recommendation or voted a particular way.  Plaintiffs cite no authority for this position.  The court finds that the evidence is relevant and admissible and will refer to it throughout this Memorandum and Order.

the site was large enough for the car dealership.  None of the Council members deposed knew

plaintiff Franklin or had heard anyone express a bias against plaintiff Franklin.

B.       DDR/CHM's Application to Change the Land Use

Developers Diversified Realty ("DDR"), a real estate developer involved in the Merriam

Village Project, bought the Burger King property from Merriam Pointe.  DDR also purchased a

parcel of property adjacent to the Burger King property, the Hostetler property.  DDR intended to

move a car dealership located in the Merriam Village Project, Country Hill Motors ("CHM"), to the

location because DDR did not want the CHM building to be a part of Merriam Village.

On April 5, 2005, DDR filed a PUD application with defendant for approval of a change of

use for the Burger King property and a change in the zoning of the Hostetler property ("the

DDR/CHM Application").  DDR usually enters into contingent purchase contracts, but this time

DDR closed on the property before receiving approval of its PUD application.  In January 2005,

Dennis Enslinger had replaced Mr. Smith as the City's Development Director.  Mr. Enslinger

authored a Staff Report on December 7, 2005 recommending approval of the DDR/CHM

Application subject to the revision of the preliminary development plan in several respects.  That

same day, the Planning Commission voted 4-2 to recommend approval of the application with

specific conditions on the operation of the dealership.  Planning Commission Chairperson Carol

Whitlock considered the DDR/CHM Application different from the Franklin Application because

DDR/CHM's application included both the Burger King and Hostetler properties, the proposed

layout was different, and the grading plan was different.  In deposition, Ms. Whitlock said that she

voted in favor of the application in part because the site would not be crowded, as it used two lots.

The owners of a hotel located next to the Burger King property filed a protest petition against

the approval of the DDR/CHM Application, but withdrew it before the City Council meeting.  The

hotel entered into a "Confidential Agreement" with DDR relating to the protest petition.

On January 23, 2006, the City Council voted 5-3 to approve the DDR/CHM Application with conditions. During the meeting, Council member Dan Leap questioned whether it would be fair to allow CHM to use the property as a car dealership after defendant had denied that opportunity to plaintiff Franklin. In deposition, Council members cited the following reasons for voting in favor of the DDR/CHM Application: (1) the use of both parcels of land and (2) the Burger King site had sat empty for some time. Two of the members who voted against the application testified in deposition that they did so for the same reasons that they voted against the Franklin Application. No Council member stated that he or she considered the impact that the relocation of CHM would have on the Merriam Village project. But Mr. Leap testified that the City Council granted the DDR/CHM Application "so [DDR] could get on with their development and two-thirds of the council always votes pro development no matter what." During the pendency of the Merriam Village Project, the City Council voted against a DDR proposal only once out of approximately ten proposals, and that denial pertained to an issue relating to a detention pond.

On March 16, 2006, the City passed Ordinance 1528, approving the DDR/CHM Application. CHM currently uses the Burger King and Hostetler properties as a car dealership.

## II.     Standard for Judgment

Summary judgment is appropriate if the moving party demonstrates that there is "no genuine issue as to any material fact" and that it is "entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c). In applying this standard, the court views the evidence and all reasonable inferences therefrom in the light most favorable to the nonmoving party. *Adler v. Wal-Mart Stores, Inc.*, 144 F.3d 664, 670 (10th Cir. 1998) (citing *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986)).

### III.   Discussion

A.   Standing of Plaintiff Franklin

Defendant argues that plaintiff Franklin lacks standing under either federal or state law to bring claims because plaintiff Franklin's alleged loss is conjectural and not personal.  Plaintiff C & F owned the property, not plaintiff Franklin.  But plaintiff completed the PUD application in his own name.  Plaintiff Franklin hoped to operate a dealership under a future lease with plaintiff C & F. Although he originally intended to operate the Suzuki dealership, by the time of the Planning Commission's hearing, the Suzuki deal was not viable.  Plaintiff Franklin had decided to sell all makes and models of pre-owned vehicles, but had not yet formed the dealership when defendant denied his application.

Plaintiff Franklin seeks damages in the form of net profits that he would have earned while operating a car dealership on the Burger King property.  While plaintiff Franklin's alleged loss is inherently uncertain to some degree, in light of the fact that he had not yet formed the dealership, the court finds that it is not so conjectural as a matter of law that it deprives him of standing to bring a claim.

B.   Equal Protection Law: "Class-of-One" Theory

Under the Constitution's Equal Protection Clause, the government must treat similarly-situated persons alike.  *Barney v. Pulsipher*, 143 F.3d 1299, 1312 (10th Cir. 1998); *see also Metropolitan Life Ins. Co. v. Ward*, 470 U.S. 869, 881 n.9 (1985) (noting that corporations are "persons" under the Fourteenth Amendment and are entitled to equal protection).  The clause applies not only where the injured person is a member of a suspect or quasi-suspect class, but also where an individual is "injured by intentional or purposeful discrimination without identification of a class." *Bartell v. Aurora Pub. Schs.*, 263 F.3d 1143, 1148–49 (10th Cir. 2001).  Here, because plaintiffs are

not members of a suspect or quasi-suspect class, they proceed pursuant to the "class-of-one" theory that the Supreme Court expressly recognized in *Village of Willowbrook v. Olech*, 528 U.S. 562, 564 (2000). "In the paradigmatic class-of-one case, a public official inflicts a cost or burden on one person without imposing it on those who are similarly situated in material respects, and does so without any conceivable basis other than a wholly illegitimate motive." *Jicarilla Apache Nation v. Rio Arriba County*, 440 F.3d 1202, 1209 (10th Cir. 2006). Courts have cautiously applied the class-of-one theory:

> Most circuits, including this one, have proceeded cautiously in applying the theory, sensitive to Justice Breyer's warning [in his concurrence in *Olech* ] against turning even quotidian exercises of government discretion into constitutional causes. An approach that reads *Olech* too broadly could transform the federal courts into "general-purpose second-guessers of the reasonableness of broad areas of state and local decisionmaking: a role that is both ill-suited to the federal courts and offensive to state and local autonomy in our federal system." Such a pervasive threat of federal litigation could straitjacket local governments that have neither the capacity to document the reasoning behind every decision nor the means to withstand an onslaught of lawsuits.

*Id.* (citations omitted).

A key inquiry in class-of-one cases is whether similarly-situated persons were treated differently. *Id.* at 1212. "Inevitably, the degree to which others are viewed as similarly situated depends substantially on the facts and the context of the case." *Jennings v. City of Stillwater*, 383 F.3d 1199, 1214 (10th Cir. 2004).

> [T]he degree of similarity an equal protection plaintiff needs to show will vary inversely with the size of the relevant class. If a plaintiff belongs to a large class, a systematic difference in treatment probably is not caused by individualized differences or statistical aberrations. But when the class consists of one person or entity, it is exceedingly difficult to demonstrate that any difference in treatment is not attributable to a quirk of the plaintiff or even to the fallibility of administrators whose inconsistency is as random as it is inevitable. Accordingly, courts have imposed exacting burdens on plaintiffs to demonstrate similarity in class-of-one cases.

*Jicarilla Apache Nation*, 440 F.3d at 1212.

The second inquiry is whether the defendant advanced grounds that are not "irrational and wholly arbitrary." *Jennings*, 383 F.3d at 1211–12. Some courts have added to this inquiry a requirement that the plaintiff also show that the defendant acted with malice or ill will. *See id.* at 1211 (compiling cases and noting that "[t]his Circuit seems to have adopted a similar approach"). But the Tenth Circuit has not overtly adopted a malice or ill will requirement, and has "struggled with the question whether class-of-one claims require an allegation of subjective ill will." *Jicarilla Apache Nation*, 440 F.3d at 1210.

1.    *Were Plaintiffs Similarly Situated to Country Hill Motors?*

Plaintiffs claim that they "are similarly situated [with Country Hill Motors] because they both sought to use the same property in the same manner (i.e., as a car dealership)." (Doc. 107, at 16). Plaintiffs' characterization of the similarities is far too broad to satisfy the rigorous inquiry in class-of-one cases. In *Jennings*, the Tenth Circuit quoted with approval a case from the District of Massachusetts that discussed an overbroad definition of "similarly situated":

> "It might be suggested that all applicants should be considered 'similarly situated' simply because they had all made requests for waivers of the dead-end street length regulation. But that is so broad a definition of 'similarly situated' that it is not useful for equal protection analysis; it could be applied to any group of applicants where, looking back, one could see that there had been some who succeeded and some who failed. For example, high school students whose applications to a particular college were rejected could allege that they were being treated differently from the 'similarly situated' fellow students whose applications were accepted. In the example, one would want to know a good deal more about the merits of individual applicants before deciding who was similarly situated to whom."

383 F.3d at 1214 (quoting *Lakeside Builders, Inc. v. Planning Bd. of Town of Franklin*, No. 00-12170-GAO, 2002 WL 31655250, at *3 (D. Mass. Mar. 21, 2002)).

Here, there are several important differences between the applications submitted by plaintiffs and DDR/CHM. First, the DDR/CHM application involved not only the Burger King property, but

also the Hostetler property to the south—two parcels of land.  Plaintiffs' application requested to put a car dealership only on the Burger King property.  Second, the Hostetler property was zoned C-O (Office Commercial), whereas the Burger King property was zoned PUD.  The zoning differences meant that the applications involved different zoning and use requests.  Third, DDR/CHM submitted its application on April 5, 2005, over a year after plaintiffs submitted their application on February 4, 2004.  This time difference is significant to the court, as it provided the opportunity for several variables to change between the time that plaintiffs filed their application and the time that DDR/CHM filed its application.  One of those variables is the amount of time that the Burger King property had been vacant.  At the time DDR/CHM applied, the property had been vacant for over a year, and the City had been unsuccessful at finding another restaurant to move into the location.  The court also notes that different Development Directors reviewed the applications.

Simply put, the applications had only one thing in common: they sought to put a car dealership in an area where a restaurant once existed.  This is not enough.  The number of differences in the applications and the environment in which the applications were being considered defeat plaintiffs' attempt to show that they were similarly situated to CHM.  For this reason, the court grants summary judgment for defendant.

2.      *Did Defendant Advance Grounds that are not "Irrational and Wholly Arbitrary"?*

Even if the court did not find the "similarly-situated" requirement lacking, the record still contains no evidence that defendant's reasons for granting the DDR/CHM Application were irrational and wholly arbitrary.  Plaintiffs argue that the following facts demonstrate that defendant's decision lacked a rational basis: (1) although Mr. Glaves had recommended granting the Franklin Application, Mr. Smith decided to recommend denial of the application without discussing the change with plaintiffs; (2) no City Council member gave any reason during the August 16, 2004

meeting as to why he or she voted to deny the Franklin Application; (3) Council members did not vote on plaintiffs' request for a continuance; and (4) DDR/CHM had "something extra" to give to defendant, but plaintiffs did not, making plaintiffs the "victims of 'dirty politicking.'"

Plaintiffs' arguments are not persuasive.  The record does not indicate that Development Directors regularly discussed their intended recommendations with applicants or that Mr. Smith had any duty to discuss it with plaintiffs.  There is also not any evidence that City Council members were required to give reasons for their votes; in fact, the record indicates that the outcome of the votes corresponded with the Development Director's recommendation ninety percent of the time. The votes on both the Franklin and DDR/CHK applications followed this trend.  Plaintiffs' evidence that Council members were required to vote on requests for continuances lacks support other than Ms. Hupp's testimony that she believed that a continuance required a vote.  In any event, even if the failure to vote on continuing consideration of the Franklin Application were a procedural irregularity, it does not suggest that the Council's later decision to approve the DDR/CHK Application was irrational or wholly arbitrary.  Moreover, plaintiffs fail to offer any evidence suggesting that "dirty politicking" was involved.  DDR's confidential agreement with the hotel next door to the lots does not suggest otherwise.

Because of all of the changes in the relevant facts between the time that plaintiffs applied to operate a car dealership on the Burger King property and the time that DDR/CHM applied to operate one on the Burger King and Hostetler plots, there are no facts in the record suggesting that defendant's different treatment of the applications was irrational and wholly arbitrary.  To the extent that plaintiffs must show either malice or ill will, they have failed to present any evidence supporting a finding of either, although the court does not base its decision on this deficiency.  The court grants summary judgment for defendant.

**IT IS THEREFORE ORDERED** that Defendant's Motion for Summary Judgment (Doc. 100) is granted.

**IT IS FURTHER ORDERED** that Plaintiffs' Motion for Partial Summary Judgment (Doc. 103) is denied as moot.

Dated this 25th day of April 2008, at Kansas City, Kansas.

**s/ Carlos Murguia**
**CARLOS MURGUIA**
**United States District Judge**